## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) HILL COMPANY, INC., a Georgia Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 24-cv-00019-SH |
| (1) AAON, INC., an Oklahoma Corporation, | ) ) ) | |
| Defendant. | ) ) | |

## **COMPLAINT**
### (JURY TRIAL DEMANDED)

**COMES NOW**, Plaintiff Hill Company, Inc. ("HCI"), by and through its attorneys of record, Tadd J.P. Bogan and Patrick G. Colvin of the law firm of Jones, Gotcher & Bogan, P.C., and for its claims and causes of action against Defendant, AAON, Inc. ("Defendant"), alleges and states as follows:

### PARTIES, JURISDICTION & VENUE

1.      HCI is a Georgia corporation with its principal place of business in the State of Georgia.

2.      Defendant is a publicly traded Oklahoma corporation with its principal place of business at 2425 South Yukon Avenue, Tulsa, Oklahoma 74107.

3.      The amount in controversy in this matter exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00).

4.      Pursuant to 28 U.S.C. § 1332(a), jurisdiction is proper in this Court by way of complete diversity of citizenship of the HCI and Defendant and the amount in controversy exceeding the sum of Seventy-Five Thousand Dollars.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)&(2), as Defendant is a resident of this judicial district, and a substantial part of the events and omissions giving rise to HCI's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### HCI's Business and Business Model

6.     HCI is a commercial heating, ventilation, and air conditioning ("HVAC") engineering, equipment sales, and manufacturers' representative company that works with manufacturers, owners, and contractors to select and configure HVAC equipment for new construction projects and existing commercial buildings.

7.     The HVAC equipment packages HCI sells often include air handlers, chillers, fans, coils, heat recovery units, make-up air units, dedicated 100% outside air units, rooftop units, desiccant dehumidifiers, exhaust air scrubbers, air-cooled condensers, and condensing units.

8.     Defendant manufactures HVAC equipment for use in the construction and operation of commercial and industrial buildings. Its product line includes rooftop units, outdoor air-handling units, indoor air-handling units, chillers, rooftop units, dedicated 100% outside air units, condensing units, water-source heat pumps, and coils.

9.     Defendant sells its HVAC products nationwide through independent businesses appointed as Defendant's manufacturer's sales representatives in assigned geographic territories.

### HCI's Nearly Two-Decade Business Relationship with Defendant

10.     HCI was Defendant's exclusive sales representative in Georgia, except for Georgia counties adjacent to Chattanooga, Tennessee and the coastal area around Savannah, Georgia, from 2001 to February 28, 2019.

11.     Initially, the relationship between HCI and Defendant was based upon an oral agreement between the principals of HCI and Defendant. Thereafter Defendant prepared, and the Parties agreed upon, written agreements which documented the different aspects of their agreements, such as HCI's specific sales territory, pricing and terms for the sale of Defendant's products, and the commissions that would be paid to HCI, including, but not limited to, the AAON Policy Manual for Sales Representatives dated January 2018, a copy of which is attached hereto as Exhibit "1" ("AAON's Sales Rep Policy Manual").

12.     When the relationship between HCI and Defendant initially began, the sales volume under Defendant's previous representative was approximately $400,000 per year. In HCI's first year, its sales volume for Defendant exceeded $1,000,0000, and grew to over $12,000,000 by 2018.

13.     In 2015, HCI's year-end sales volume for Defendant was $11,954,757, and its total sales volume was $16,410,463.

14.     In 2016, HCI's year-end sales volume for Defendant was $7,792,667, and its total sales volume was $13,404,035.

15.     In 2017, HCI's year-end sales volume for Defendant was $11,928,047 and its total sales volume was $14,168,744.

16.     In 2018, the last year before Defendant terminated HCI's sales representative agreement and changed its representative in Georgia, HCI's year-end sales volume for Defendant was $12,623,616 and its total sales volume was $19,122,366.

17.     HCI consistently met and exceeded Defendant's sales expectations and received sales awards and other accolades from Defendant, until Defendant ceased its practice of awarding annual awards to its representatives in or around 2016.

**HCI's Extensive Investment in the AAON Relationship**

18.     HCI relied upon Defendant's continued business for its growth and made substantial investments in reliance thereon.

19.     In addition to the following, between 2014 and 2018, HCI hired 18 new employees to achieve the growth desired by Defendant.

20.     In 2006, HCI's President, Edwin Hill ("Hill") formed an entity in Jacksonville, Florida, Hill Company, LLC ("HCLLC"), with Defendant's products as its primary product line. HCLLC covered Jacksonville, Tallahassee, and Ocala, Florida for Defendant.

21.     In 2007, HCI built a large retail facility in Roswell, Georgia, in response to Defendant's stated desire to have "brick and mortar" presence in its sales territories to show commitment to the markets.

22.     In 2008, Hill established a second Florida entity in Pensacola, Florida, Hill Company Gulf States, LLC ("HC Gulf States") to represent Defendant in the pan-handle cities from Tallahassee, Florida to Mobile, Alabama, including the lower counties in Alabama.

23.     In 2013, HCI formed a company called HESCO, a factory trained service organization primarily for the startup of Defendant's equipment and to provide labor warranty services. HESCO employed a service manager, service coordinator, and five service technicians in Georgia.

24.     In 2014, HCI formed Equipment and Engineering Services Group ("ESSG") in Georgia to provide inside sales support for HCI's outside sales group. ESSG employed a manager and three degreed engineers.

25.     In 2014, HCI performed substantial renovations to its building to add a dedicated AAON retail parts store and facility, as requested by Defendant, which included an initial inventory purchase from Defendant in the sum of $150,000.

26.     In total, HCI has spent $4,225,775, to construct and renovate its facilities in Georgia at the behest of Defendant.

27.     In 2015, HCI met with Defendant for the purpose of presenting a strategic business plan for HCI to grow through territory expansion. HCI's proposal was for HCI to represent Defendant throughout the state of Alabama. Defendant assured HCI that it would contact HCI if Defendant made changes to its representation in Alabama, but failed to do so when such changes were made.

28.     In 2016, HCI sold HCLLC, its Jacksonville, Florida entity, to three employees/partners in the business in accordance with the company's succession plan, which was voluntarily shared with Defendant prior thereto.

**<u>Defendant's Unprecedented Demands for an HCI Succession Plan</u>**

29.     Shortly after HCLLC successfully executed its succession plan in 2016, Defendant asked HCI for a written succession plan for HCI, including HCI's long-term plan for how HCI would grow with Defendant.

30.     HCI provided Defendant with a Strategic Snapshot of HCI with its long-term plan in December of 2016, but Defendant said HCI's proposed plan was not acceptable to Defendant.

31.     On June 15, 2017, Hill sent an email to Sam Hammoud at AAON detailing HCI's plan to continue its success and growth alongside Defendant. This email further sets out three potential succession plans for HCI. (*See* email dated June 15, 2017, attached hereto as Exhibit "2")

Significant portions of HCI's succession plan mirrored the successful succession plan deployed by HCI with HCLLC in Jacksonville in 2016.

32.     HCI's succession Plan A provided a strategy of promoting existing senior employees from within HCI to positions of ownership in the future. (*See id*.)

33.     HCI's succession Plan B served to notify Defendant that HCI was considering the costs and benefits of being acquired by Texas Airsystems, LLC ("Texas Air"), which was the suggestion of Gary Fields ("Fields"), the President and CEO of Defendant, who was a previous owner of Texas Air. (*See id*.)

34.     HCI's succession Plan C refers to earlier discussions between HCI and Defendant about HCI growing by acquiring another local HVAC firm with complementary products. (*See id*.)

35.     Upon information and belief, and according to Defendant's Vice President of Sales and Marketing, HCI was the only manufacturer's representative in the world from whom Defendant has requested a succession plan.

36.     In addition to constructing a new facility and later adding a dedicated retail parts store to that facility for Defendant, hiring additional employees and expanding its service capabilities, and investing in training and numerous other areas of its business, HCI demonstrated its desire to continue growing with Defendant by producing multiple succession plans for the future growth of HCI, as requested by Defendant, despite the same not being required or otherwise within the scope of AAON's Sales Rep Policy Manual.

### Defendant's Termination of HCI Without Cause and the Resulting Devastation to HCI's Business

37.     On January 23, 2019, Defendant unexpectedly terminated HCI as Defendant's manufacturer's sales representative *via* a telephone call to Hill.

38.     On or about January 23, 2019, Defendant provided HCI with a termination letter stating, among other things, "AAON has decided to change our representation in Georgia. This letter serves as your notice that AAON is cancelling [HCI] as an AAON representative… The relationship between AAON and [HCI] will cease on February 28, 2019." (See AAON letter dated January 23, 2019, attached hereto as Exhibit "3")

39.     Defendant's January 23, 2019, notice of termination failed to state all reasons constituting good cause for HCI's termination as required by Oklahoma law. (*See* Ex. 3 and 15 O.S. § 245A.2(A)) In fact, the notice did not state any reasons for HCI's termination.

40.     Over two weeks later, in a thinly veiled effort to justify its wrongful termination of HCI, Defendant sent HCI a letter stating that HCI's inconsistent sales volume, lack of demonstrable desire to grow with Defendant, and HCI's response to Defendant's request for a written succession plan for HCI were the reasons for Defendant's termination of HCI. (*See* AAON letter dated February 8, 2019, attached hereto as Exhibit "4")

41.     As evidenced by complete absence of any justification for Defendant's termination of HCI in the January 23, 2019 letter and the misrepresentations contained in the subsequent February 8, 2019 letter, Defendant's reasons for terminating HCI's sales representative agreement were clearly pretextual, and its termination of HCI was unjustified, malicious, and done in bad faith.

42.     As set forth herein below, Defendant's termination of HCI clearly violated Oklahoma law and the agreement between HCI and Defendant.

43.     Moreover, Defendant's unjustified termination of HCI after years of HCI's monetary commitment to the relationship left HCI in financial ruin.

44.     In 2019, the year following Defendant's termination of its agreement with HCI and Defendant's other actions described herein, HCI's year-end sales volume dropped by over 50% to just $8,493,608, with $6,712,815 of those sales coming from ongoing projects for Defendant at the time of HCI's termination.

45.     In 2020, HCI's year-end sales volume continued tumbling and was $4,435,635.

46.     In 2021, HCI's year-end sales volume declined further to only $2,410,335.

47.     In 2022, HCI's year-end sales volume began to recover and was $6,384,423.

48.     However, in 2023, HCI's year-end sales volume dropped again, due to reasons stated herein below, and was $4,273,024.

49.     Upon terminating the contract between Defendant and HCI, Defendant required HCI to provide it with a list of all projects that were in progress or expected to be ordered by April 20, 2019, including orders that have been bid and are awaiting Purchase Order, on or before February 4, 2019. (*See* Ex. 3)

50.     On February 4, 2019, HCI provided Defendant with its list of ongoing and expected projects (the "Project List").

51.     In order to compile the Project List, HCI met with its salespeople and together they identified all projects that were responsive to Defendant's inquiry.

52.     On February 8, 2019, Defendant responded to HCI's Project List stating, that "[i]t looks like every job in the Georgia territory is on this list. I am sure you are aware Georgia is showing a lot of growth. There is great potential for sales in Georgia… Any job that your company is not actively pursuing with AAON product will not be protected." (*See* Ex. 4)

### Gary Fields's Multiyear Plan to Undermine and Target HCI

53.     In 2015, Fields was elected to Defendant's Board of Directors.

8

54.   In 2016, Fields was elected as Defendant's President, and he remained on the board.

55.   Prior to Fields becoming the President of Defendant, and as recently as February 16, 2016, the founder, President, and CEO of Defendant, Norm Asbjornson, was complimentary of HCI and the steps it had taken to advance HCI in the industry. (*See* email dated February 16, 2016, attached hereto as Exhibit "5")

56.   As discussed below, once Fields became President of Defendant, he set his sights on destroying HCI.

57.   Prior to his association with Defendant, Fields worked for, and owned an interest in, Texas Air.

58.   Texas Air was also a manufacturer's representative for Defendant.

59.   In 2016, Fields's former company, Texas Air, and another AAON representative, Hobbs & Associates, Inc., formed a joint venture called Insight Partners, LLC ("Insight"), and together they formed new entities known as HT Airsystems to be representatives for Defendant.

60.   Notably, Insight was formed the same year Fields was promoted to President of AAON, Inc., and would subsequently play a pivotal role in Defendant's destruction of HCI.

61.   In December of 2016, after HCI presented its Strategic Snapshot and long-term plan, Fields suggested to Hill that he needed to bring in equity partners and told Hill that he needed to speak with the founder of Texas Air, Jerry Braun ("Braun"), about Texas Air about becoming an equity partner with HCI.

62.   At Fields's request, Hill spoke with Braun about a potential partnership between HCI and Texas Air.

63.   However, Texas Air and Braun informed Hill that Texas Air was not interested in a partnership with HCI, but that Texas Air was interested in purchasing HCI from Hill.

64.     Braun informed Hill that Texas Air was interested in purchasing HCI because Texas Air had the ability and means to recruit top talent in the industry, which Braun did not think HCI possessed.

65.     Hill ended HCI's discussions with Texas Air because Hill was not interested in selling HCI to Texas Air, and Texas Air had made it clear it was not interested in being HCI's partner.

66.     In December of 2017, Defendant terminated HC Gulf States's dealer agreement.

67.     In an effort to put HCI out of business and punish HCI for refusing to sell HCI to Texas Air, Defendant began executing its plan to completely eliminate HCI and replace it with an Insight entity.

68.     Insight would go on to operate in Georgia, South Carolina, and North Carolina, representing Defendant in each of those territories, after HCI was terminated as Defendant's Georgia representative.

69.     Months before Defendant terminated HCI's sales representative agreement, Defendant set a plan in motion for Insight to form a new entity to take over HCI's territory for Defendant. On January 17, 2019, Insight formed HT Airsystems of Georgia, LLC in Delaware.

70.     On January 23, 2019, Defendant effectuated its plan by terminating HCI without cause, and shortly thereafter formally appointing Insight's HT Airsystems of Georgia, LLC as its manufacturer's sales representative in Georgia.

71.     On February 8, 2019, the same day Defendant first provided HCI pretextual reason for terminating HCI, Defendant sent Insight a "Welcome Letter" dated October 11, 2018, welcoming HT Airsystems of Georgia as its new Georgia sales representative. (*See* email dated February 8, 2019, attached hereto as Exhibit "6")

72.     On February 22, 2019, HT Airsystems of Georgia, LLC was registered to do business in the state of Georgia.

73.     As demonstrated by the stark decline in sales volumes outlined above, Defendant's unlawful termination of its agreement with HCI devastated HCI's business and caused it substantial economic damages.

74.     However, Defendant's assault upon HCI's business did not stop with its wrongful termination of HCI's sales representative agreement.

### Defendant's Malicious Effort to Prevent HCI's Post-Termination Recovery

75.     Defendant used its inside knowledge of HCI's salesforce to cause its top three salesmen to terminate their contracts shortly after Defendant terminated its agreement with HCI. Unbeknownst to HCI, Insight began discussions with HCI's salesforce six days after Defendant wrongfully terminated HCI, if not sooner.

76.     Specifically, Andy Chapman ("Chapman"), Josh Taylor ("Taylor"), and Ermal Kendall "Kenny" Allen, Jr. ("Allen") were longtime salespeople for HCI, and HCI's top performers.  Chapman and Taylor were also included in HCI's succession Plan A, which designated them to take over HCI when Hill retired. All three of these individuals now work for Insight in Georgia.

77.     On December 7, 2018, Sam Hammoud, a Regional Sales Manager for Defendant, advised Mark Murray, the CEO of Insight, that Taylor, Chapman, and Allen were "very good producers" for HCI, that he believed they would be open to the idea of working for Insight, and that they cover different parts of the State of Georgia for HCI. (*See* email dated 12/7/18, attached hereto as Exhibit "7")

78.     Defendant possessed the information about HCI's salespeople and the territories they covered due to its longtime relationship with HCI and Defendant's agreements with HCI.

79.     The agreements between HCI and Defendant had not been terminated at the time Defendant began using that information to destroy HCI's business.

80.     HCI was Defendant's manufacturer's sales representative in Georgia and was actively working to promote and sell Defendant's products at the same time Defendant encouraged Insight to poach HCI's top salespeople, shared information about the areas they covered, and encouraged them to recruit one another to go to Insight.

81.     Further, Defendant, as early as December 7, 2018, advised Insight to recruit HCI's salespeople despite Defendant's eventual claim that HCI's contract was terminated for inconsistent sales performance.

82.     Furthermore, Insight has hired 8 employees away from HCI since successfully recruiting Taylor, Chapman, and Allen to leave HCI, which has further decimated HCI's business.

83.     Notably, Texas Air, which is part of Insight, told Hill that Texas Air wanted to acquire HCI, rather than form a partnership with HCI, because Texas Air had the ability to recruit better talent than HCI. However, when HCI stated that it was not interested in selling to Texas Air, Insight, with Defendant's assistance, used inside information from Defendant to recruit HCI's top talent away from HCI before, or within six days, of Defendant causing HCI to lose its largest equipment manufacturer.

84.     Therefore, Texas Air claimed it did not want to partner with HCI because Texas Air/Insight could recruit better talent that HCI, and Defendant claimed it was terminating HCI's contract due to inconsistent sales performance, but Insight recruited HCI's salesmen at Defendant's suggestion as soon as Insight was to become Defendant's Georgia representative.

85.     HCI did not discover Defendant's scheme and/or the December 7, 2018, email from Sam Hammoud to Mark Murray ("Murray"), Ex. 7, until receiving a copy thereof as part of document production in a separate lawsuit on April 28, 2022.

86.     Defendant further attempted to cover up its wrongdoing by refusing to comply with a Subpoena Duces Tecum issued in the separate lawsuit referenced above, and by failing to adequately prepare a 30(b)(6) representative to testify at his deposition so that he could claim ignorance to these issues.

87.     Prior to having subpoena powers afforded to it by the aforementioned lawsuit, HCI had no way of discovering Defendant's covert plan to: terminate its agreement with HCI without cause, replace it with a newly formed Insight entity, and recruit HCI's top talent away from HCI while it was reeling from the unexpected loss of Defendant's business.

88.     As further proof that HCI had no way of discovering Defendant's wrongful acts prior to April 28, 2022, Defendant claims it still cannot locate the December 7, 2018, email from Sam Hammoud to Murray, attached as Ex. 7.

## COUNT I
## VIOLATION OF THE FAIR PRACTICES OF EQUIPMENT MANUFACTURERS, DISTRIBUTORS AND DEALERS ACT (15 O.S. § 244 *et seq.*)

89.     HCI hereby incorporates and realleges the allegations contained in paragraph numbers one (1) through eighty-eight (88) above.

90.     Pursuant to AAON's Sales Rep Policy Manual, Ex. 1, HCI's appointment as Defendant's manufacturer's sale representative was and is governed and construed in all respects in accordance with the laws of the State of Oklahoma. (*See* Ex. 1, p.7, ¶ 14)

91.     The Fair Practices of Equipment Manufacturers, Distributors and Dealers Act, 15 O.S. § 244 *et seq.* (the "Act"), was enacted to "regulate the business relations between the

independent dealers and the equipment suppliers as contemplated in the [Act]" because such relationships "vitally affect[] the general economy of this state, the public interest and the public welfare" and "any action taken in violation of [the Act] will result in a violation of an important public policy of this state." 15 O.S. § 244A.

92.     Section 245A.2 of the Act provides in pertinent part, "a supplier must provide a dealer **at least one hundred eighty (180) days prior written notice of termination of a dealer agreement**. The notice **must state all reasons constituting good cause** for such termination and **must state that the dealer has sixty (60) days in which to cure any claimed deficiency**. If the deficiency is rectified within sixty (60) days, the notice will be void." 15 O.S. § 245A.2 (emphasis added).

93.     Further, pursuant to the Act, **[n]o supplier may terminate a dealer agreement without good cause**." 15 O.S. § 245A.1(A) (emphasis added).

94.     "'Good cause' means the failure by a dealer to substantially comply with **essential and reasonable requirements imposed upon the dealer by the dealer agreement**, **provided such requirements are not different from those requirements imposed on other similarly situated dealers** either by their terms or in the manner of their enforcement" and includes, but is not limited to, instances where a dealer: "transfers[ ] a controlling interest in its business without the supplier's consent"; files bankruptcy; changes locations without prior approval of the supplier; defaults "under any chattel mortgage or other security agreement between the dealer and the supplier, or revokes a guarantee of the dealer's present or future obligations to the supplier"; "fails to operate in the normal course of business for seven (7) consecutive days or has otherwise abandoned its business"; has "pleaded guilty to, or been convicted of, a felony affecting the relationship between the dealer and supplier"; "has engaged in conduct injurious or detrimental to

the dealer's customers or the public welfare or the representation or reputation of the supplier's product"; or "has consistently failed to meet and maintain the supplier's requirements for reasonable standards and performance objectives, so long as the supplier has given the dealer reasonable standards and performance objectives that are based on the manufacturer's experience in other comparable market areas." 15 O.S. § 245A.1(A) (emphasis added).

95.     The Act defines "supplier" as any person engaged in the business of manufacturing, assembly or wholesale distribution of equipment or repair parts. 15 O.S. § 245(21).

96.     Defendant is a supplier as defined by the Act.

97.     "Dealer" is defined by the Act as "any person primarily engaged in the business of: a. Selling or leasing equipment or repair parts to the ultimate consumer, and b. repairing or servicing equipment." 15 O.S. § 254(3).

98.     HCI is a dealer as defined by the Act.

99.     "Dealer agreement" is defined by the Act as "an oral or written agreement or arrangement for a definite or indefinite period between a dealer and a supplier that provides for the rights and obligations of the parties with respect to the purchase or sale of equipment or repair parts." 15 O.S. § 245(4).

100.     "Equipment" is defined by the Act to include "machinery, equipment, implements or attachments therefor, used for or in connection with… industrial, construction, maintenance, mining or utility activities or applications." 15 O.S. § 245(7).

101.     The Act applies to "all dealer agreements now in effect which have no expiration date and are continuing contracts…" and all agreements entered into or renewed after November 1, 2011. *See* 15 O.S. § 245A.1.

102.    Defendant manufactures commercial HVAC equipment and parts for industrial and/or construction purposes. HCI sells commercial HVAC equipment and parts for industrial and/or construction purposes.  HCI and Defendant were parties to an agreement, Ex. 1, which provides for the rights and obligations of the parties with respect to the purchase or sale of equipment and repair parts.

103.    HCI has abided by all of the requirements of the dealer agreement, and none of the acts constituting "good cause" listed in Section 245A.1 have occurred. Therefore, Defendant violated the Act when it terminated HCI's dealer agreement without good cause.

104.    Further, Defendant violated the Act by failing to provide HCI with at least one hundred eighty (180) days prior written notice of termination of HCI's dealer agreement, and by failing to state that HCI had sixty (60) days in which to cure any claimed deficiency, as required by 15 O.S. § 245A.2(A).

105.    The Act also provides that it is a violation of the Act "[t]o prevent by contract or otherwise, any dealer from changing its capital structure or the means by or through which the dealer finances its operations, so long as the dealer gives prior notice to the supplier, and provided the dealer at all times meets any reasonable capital standards required by the supplier pursuant to a right granted in the dealer agreement and imposed on similarly situated dealers." 15 O.S. § 245A(7).

106.    Defendant violated the Act by requiring HCI to provide Defendant with a succession plan and long-term business plan when HCI had a reasonable capital structure in place, and when such requirements were not imposed upon similarly situated dealers.

107.    Pursuant to the Act, "[i]f any supplier violates any provision of this act, a dealer may bring an action against such supplier in a court of competent jurisdiction for damages

sustained by the dealer as a consequence of the supplier's violation, including, but not limited to, damages for lost profits, together with the actual costs of the action, including the dealer's attorney and paralegal fees and costs of arbitrators, and the dealer also may be granted injunctive relief against unlawful termination.  The remedies set forth in this section shall not be deemed exclusive and shall be in addition to any other remedies permitted by law." 15 O.S. § 248.

108.    HCI's representation of Defendant made up approximately eight percent (80%) of HCI's business. Without Defendant's product line, HCI's annual sales volume plummeted from a high of $19,062,773 in 2018 (just before Defendant's wrongful termination of its dealer agreement) to a low of $2,410,335 in 2021. HCI likely will not recover from Defendant's violation of the Act for many years. The resulting monetary loss to HCI exceeds Forty Million Dollars ($40,000,000).

109.    HCI has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as a result of Defendant's violation of the Act, plus attorney fees and costs.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT

110.    HCI hereby incorporates and realleges the allegations contained in paragraph numbers one (1) through one hundred nine (109) above.

111.    Chapman, Taylor and Allen each had written Sales Representative Agreements with HCI, and Defendant was aware of those agreements at all relevant times.

112.    For the sole purpose of intentionally and maliciously injuring HCI's business, Defendant shared the names and information about the territories of HCI's top three salesman with Insight, interfered with HCI's contracts with its salesmen, and induced HCI's salesmen to nearly simultaneously terminate their contracts with HCI and breach the same by soliciting each other to leave HCI to go to Insight's startup company in Georgia.

113.    Upon information and belief, Defendant discussed the foregoing with HCI's salesmen prior to giving their names to Insight, as Sam Hammoud's email states, "I think all 4 will be open to the idea of working for you" at a time when there would be no reason for the salesmen to leave HCI after each had spent years working with HCI, and when two of them were included in HCI's long-term succession plan.

114.    The dealer agreement between Defendant and HCI had not yet been terminated when Defendant provided Insight with information about HCI's top salesmen.

115.    Defendant did not stand to benefit from HCI's salespeople terminating their agreements with HCI, which only served to destroy HCI's business in favor of Insight, a company with significant connections to Texas Air and Fields.

116.    Defendant used improper or unfair means to interfere with HCI's contracts with Chapman, Taylor, and Allen, by, among other things: using information about HCI's salesmen that Defendant only possessed due to the dealer agreement between Defendant and HCI; sharing information about HCI's top salesmen with a competitor of HCI; and recruiting Chapman, Taylor, and Allen for Insight before or immediately after wrongfully terminating HCI's dealer agreement.

117.    Notably, HCI represents other equipment manufacturers, and has attempted to replace Defendant with another large HVAC manufacturer, but HCI has lost the skill, experience, and knowledge of its top three salespeople due to Defendant's interference described herein.

118.    Further, as stated above, HCI met with its sales force to put together the Project List, and Chapman, Taylor, and/or Allen have sold jobs on HCI's Project List for Insight after leaving HCI.

119.    The foregoing resulted in the loss of tens of millions of dollars in sales for HCI.

120.     As a result of Defendant's tortious interference with HCI's contracts with Chapman, Taylor, and Allen, HCI has been damaged in excess of Seventy-Five Thousand Dollars ($75,000.00).

**COUNT III**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

121.     HCI hereby incorporates and realleges the allegations contained in paragraph numbers one (1) through one hundred twenty (120) above.

122.     Upon terminating the contract between Defendant and HCI, Defendant required HCI to produce its Project List.

123.     Chapman, Taylor, and Allen, who unbeknownst to HCI were already being recruited by Defendant and Insight, helped HCI with the preparation of its Project List and sold jobs on the Project List for Insight after leaving HCI.

124.     Chapman, Taylor, and Allen also had knowledge of HCI's sales strategies, its customers, other manufacturers (often referred to as "lines") represented by HCI, and lines HCI planned to target to replace Defendant. Specifically, without knowing Chapman, Taylor, and Allen were already being recruited by Insight, HCI shared and explained its future plans for its business and the lines it would target to replace Defendant ("HCI's Recovery Plan") with Chapman, Taylor, and Allen.

125.     Defendant and Insight have successfully torpedoed HCI's Recovery Plan, as Chapman, Taylor, and/or Allen have targeted lines HCI planned to pursue after Defendant wrongfully terminated HCI's dealer agreement with Defendant and caused existing lines to leave HCI for Insight.

126.     As set forth in Ex. 4, HCI's project list included 250 current and potential jobs for HCI in a growing Georgia market.

127.    HCI had valid business relations and expectancy with its customers and potential customers, and with members of its salesforce.

128.    Defendant had knowledge of HCI's relationships and expectancy through the Project List, its succession planning, and its long-standing relationship with Defendant.

129.    Defendant intentionally interfered with HCI's relationships and expectancies by, among other things: unlawfully terminating HCI's dealer agreement without cause and without sufficient notice; requiring HCI to disclose every project and potential project it was working on, and refusing to protect any job HCI was not actively pursuing with Defendant's products; interfering with HCI's top salespeople using inside knowledge of their performance and the territories they covered for HCI; and using its knowledge of HCI's succession Plan A to lure two of the planned successors to Hill away from HCI.

130.    Defendant's intentional interference with HCI's relationships and expectancy with its customers, potential customers, and salespeople (who were working with many of those customers) induced and caused a breach or termination of those customer and sales representative relationships and expectancies.

131.    Defendant's intentional interference with HCI's prospective economic advantage was done with malice and for the purpose of disrupting and destroying HCI's business, and caused HCI's revenue to be reduced by over eighty-five percent (85%). This virtually eliminated all of the expected profits that would have been generated by HCI's customers and its top salespeople.

132.    The foregoing resulted in the loss of tens of millions of dollars in sales for HCI.

133.    As a result of Defendant's interference with HCI's prospective economic advantage, HCI has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## COUNT IV
## PRIMA FACIE TORT / MALICIOUS WRONG

134.    HCI hereby incorporates and realleges the allegations contained in paragraph numbers one (1) through one hundred thirty-three (133) above.

135.    Defendant intentionally caused injury to HCI.

136.    Defendant's intentional acts were done with malice and were calculated to damage HCI and HCI's trade without just cause.

137.    Defendant's acts in fact caused injury to HCI's business interests.

138.    Notably, Defendant maliciously used its inside knowledge of HCI's salespeople, the areas of Georgia they serviced, and HCI's plans for them to succeed Hill to effectively eliminate HCI's salesforce and future competition from HCI.

139.    In an effort to justify terminating HCI's dealer agreement, Defendant falsely claimed HCI's agreement was being terminated due to inconsistent sales performance, and then had its new Georgia representative hire HCI's salesforce.

140.    HCI has suffered damages in excess of Seventy-Five Thousand Dollars ($75,000.00) as a result of Defendant's malicious wrong / prima facie torts.

## COUNT V
## BREACH OF CONTRACT

141.    HCI hereby incorporates and realleges the allegations contained in paragraph numbers one (1) through one hundred forty (140) above.

142.    HCI and Defendant entered into a contract for HCI to serve as Defendant's exclusive manufacturer's sales representative in Georgia, which pursuant to Oklahoma law (the Act) could only be terminated for cause, and with sufficient notice and an opportunity to cure deficiencies.

143.    As a result of the contract between HCI and Defendant, Defendant owed HCI a duty of good faith and fair dealing.

144.    Defendant breached its duty of good faith and fair dealing to HCI by, among other things: terminating the parties' contract without cause; failing to give HCI sufficient notice of the termination of the contract; encouraging a competitor to hire HCI's salesforce when the same was not publicly available and while Defendant remained under contract with HCI; providing pretextual reasons for terminating the agreement; placing unreasonable and unnecessary requirements upon HCI in order to justify terminating the HCI's contract; and maliciously interfering with HCI's business, its contracts, and its prospective economic advantage.

145.    HCI has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) as a result of Defendant's breach of its contract with HCI.

**WHEREFORE**, premises considered, Plaintiff Hill Company, Inc. prays the Court enter judgment in its favor and against Defendant AAON, Inc. on each of its causes of action herein, and award it damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), plus punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), attorney fees, costs, and all other relief the Court deems just and equitable.

Respectfully submitted,

s/Tadd J.P. Bogan
Tadd J.P. Bogan, OBA# 20962
Patrick G. Colvin, OBA# 31519
JONES, GOTCHER & BOGAN, P.C.
15 East Fifth Street, Suite 3800
Tulsa, Oklahoma 74103
Telephone:    (918)581-8200
Facsimile:    (918)583-1189
Email: tbogan@jgbok.com
         pcolvin@jgbok.com
*Attorneys for Plaintiff, Hill Company, Inc.*